# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 9, 2014　　　　　　Decided March 28, 2014

No. 13-5281

AMERICAN MEAT INSTITUTE, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01033)

———

*Catherine E. Stetson* argued the cause for appellants. With her on the briefs were *Jonathan L. Abram*, *Judith E. Coleman*, *Mary Helen Wimberly*, and *Elizabeth B. Prelogar*.

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Mark B. Stern*, Attorney.

*Terence P. Stewart* was on the brief for intervenors United States Cattlemen's Association, et al. in support of appellees.

*Zachary B. Corrigan* was on the brief for *amici curiae* Food and Water Watch, Inc., et al. in support of appellees.

*Jonathan R. Lovvorn* and *Aaron D. Green* were on the brief for *amicus curiae* American Grassfed Association, et al. in support of appellees.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:   In 2013 the Agricultural Marketing Service ("AMS"), a branch of the Department of Agriculture, adopted a rule modifying its prior rule implementing Congress's requirements of country-of-origin labeling ("COOL"). Mandatory Country of Origin Labeling, 78 Fed. Reg. 31,367 (May 24, 2013) ("2013 rule"). The rule requires retailers of "muscle cuts" of meat, i.e., covered meat other than ground meat (which is governed by 7 U.S.C. § 1638a(a)(2)(E)), to list (with some qualifications) the countries of origin and production steps—born, raised or slaughtered—occurring in each country. *Id*. at 31,367/3. The AMS's previous rule had merely required a list of the countries of origin (again with some qualifications) preceded by the phrase "Product of." Mandatory Country of Origin Labeling, 74 Fed. Reg. 2658, 2706 (Jan. 15, 2009) ("2009 rule"). The 2013 rule also eliminated the prior rule's allowance for commingling—a practice by which cuts from animals of different origins, but processed on the same day, could all bear identical labels.

The appellants, a group of trade associations representing livestock producers, feedlot operators, and meat packers, whom we'll collectively call American Meat Institute

("AMI"), challenged the 2013 rule in district court as a violation of the COOL statute and the First Amendment. AMI moved for a preliminary injunction halting enforcement, and the district court denied the motion. Agreeing with the district court that AMI is unlikely to succeed on the merits of its claims, and believing that any error in the district court's balancing of the other factors governing issuance of a preliminary injunction could not on these facts outweigh the likely outcome on the merits, we affirm.

* * *

The COOL statute, 7 U.S.C. § 1638a, adopted in 2008, assigns retailers an obligation to inform consumers of a cut's country of origin. This may be quite complicated where an animal was born, raised, and slaughtered in more than one country. *Id*. § 1638a(a)(2). The statute sets forth four categories of muscle-cut meat and how to determine the country of origin depending on the locale of the production steps:

> (A) *United States country of origin[.]* A retailer . . . may designate the covered commodity as exclusively having a United States country of origin only if the covered commodity is derived from an animal that was . . . exclusively born, raised, and slaughtered in the United States . . . .

> (B) *Multiple countries of origin[.]* A retailer of a covered commodity . . . that is derived from an animal that is (I) not exclusively born, raised, and slaughtered in the United States; (II) born, raised, or slaughtered in the United States, and (III) not imported into the United States for immediate slaughter, may designate the country of origin of such covered commodity as all of the

countries in which the animal may have been born, raised, or slaughtered.

(C) *Imported for immediate slaughter[.]*  A retailer of a covered commodity . . . that is derived from an animal that is imported into the United States for immediate slaughter shall designate the origin . . . as . . . the country from which the animal was imported; and . . . the United States.

(D) *Foreign country of origin[.]*  A retailer of a covered commodity . . . that is derived from an animal that is not born, raised, or slaughtered in the United States shall designate a country other than the United States as the country of origin . . . .

*Id*. (emphases added).  The parties call meat covered by § 1638a(a)(2)(A) "Category A meat," that covered by § 1638a(a)(2)(B) "Category B meat," and so on.  The COOL statute also requires the Secretary of Agriculture to "promulgate such regulations as are necessary to implement" the statutory regime.  *Id*. § 1638c(b).

The 2009 rule did not demand explicit identification of the country for each of the three production steps—born, raised and slaughtered.  It called more simply for labeling with a phrase starting "Product of," followed by mention of one or more countries.  7 C.F.R. § 65.400 (2010).  So Category A meat would be labeled, "Product of the United States"; Category B meat would be labeled, "Product of the United States and X"; Category C meat would be labeled, "Product of X and the United States"; and Category D meat would be labeled "Product of X."  See *id*.; see also *id*. § 65.300 (2010).

The 2009 rule also made allowance for a production practice known as "commingling." This occurs when a firm processes meat from animals with different countries of origin on a single production day. 7 C.F.R. § 65.300(e)(2), (e)(4) (2010). The rule allowed retailers to label commingled meat cuts with all the countries of origin for all the commingled animals. As a result, Category A meat processed on the same day as Category B or C meat could be labeled "Product of United States and X." *Id.*

In the year of the 2009 rule's adoption, Canada and Mexico filed a complaint with the Dispute Settlement Body of the World Trade Organization, which found the rule to be in violation of the WTO Agreement on Technical Barriers to Trade. 2013 rule, 78 Fed. Reg. at 31,367/2. The gravamen of the WTO's ruling appears to have been an objection to the relative imprecision of the information required by the 2009 rule. See Appellate Body Report, *United States—Certain Country of Origin Labelling (COOL) Requirements*, ¶ 343, WT/DS384/AB/R (Jun. 29, 2012). A WTO arbitrator gave the United States until May 23, 2013, to bring its COOL requirements into compliance with the ruling. 2013 rule, 78 Fed. Reg. at 31,367/2.

The 2013 rule increased the required level of precision. Now, except for Category D meat, each country of origin would generally be preceded by the production step that occurred in that country. *Id.* at 31,385/3. For instance, instead of saying, "Product of the United States," a label for Category A meat will now read, "Born, Raised, and Slaughtered in the United States." *Id.* Similarly, Category B meat might now have to be labeled, "Born in X, Raised and Slaughtered in the United States," and Category C meat "Born and Raised in X, Slaughtered in the United States." *Id.* The 2013 rule also eliminated the special allowance for commingled meat. *Id.* at 31,367/3.

AMI challenged the 2013 rule in district court as (1) exceeding the authority granted by the COOL statute, and (2) violating the First Amendment. AMI also moved for a preliminary injunction halting enforcement of the 2013 rule, which the district court denied. AMI contends on appeal to us that the district court erred in its determination that AMI is unlikely to succeed on the merits of either claim. We review questions of law—AMI's substantive claims—de novo. *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011). Because we disagree with AMI on its chances of success on the merits, we affirm the district court.

\* \* \*

At oral argument the question arose whether AMI has standing to raise its claims. None of the appellants is a retailer, the type of market actor expressly covered by the bulk of the COOL requirements. See 7 U.S.C. § 1638a(a). But § 1638a(e) requires that upstream producers "provide information to the retailer indicating the country of origin of the covered commodity." In effect, then, the appellants are required to make the same disclosures that retailers are, only to a different recipient. Accordingly, we are satisfied that the challenged regulations inflict on AMI the sort of injury-in-fact needed for Article III standing. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

We thus turn to AMI's arguments as to why the COOL statute does not authorize the 2013 rule: (1) the rule "bans" commingling, and therefore alters production practices over which the COOL statute gives the Secretary no authority; and (2) production-step labeling is both outside of and contrary to the plain language of the COOL statute. We are not persuaded.

AMI's argument that the rule unlawfully "bans" commingling fails at a key first step—the 2013 rule does not actually ban any element of the production process. It simply requires that meat cuts be accurately labeled with the three phases of production named in the statute. It appears that under current practices meat packers cannot achieve that degree of accuracy with commingled production. The necessary changes to production are, to be sure, costly for the packers, but, contrary to AMI's claim, the new rule does not "force the segregated handling of animals with varying geographical histories," except in the sense that compliance with any regulation may induce changes in unregulated production techniques that a profit-seeking producer would not otherwise make.

This practical burden on an existing practice would be problematic if the statute required an exception for the practice. But AMI points, at most, to a statutory ambiguity on the issue of commingling. AMI contends that since § 1638a(a)(2)(B)(i) allows retailers to designate "all of the countries in which the animal *may have been* born, raised, or slaughtered" (emphasis added), the statute expressly contemplates an allowance, where animals processed in a single day have traversed different countries, for listing all such countries, as did the 2009 rule. Although the use of "may have been" in § 1638a(a)(2)(B)(i) is perhaps ambiguous, it by no means renders the absence of a commingling allowance unreasonable. In a section dealing with ground meat Congress expressly authorized retailers to provide "a list of all reasonably possible countries of origin." *Id.* § 1638a(a)(2)(E). This at least hints at the kind of flexibility AMI desires—in a different context. In contrast, Category B's use of the words "may have been" appears next to references to "an" animal and "the" animal. See *id.* § 1638a(a)(2)(B)(i). Congress's use of singular articles certainly supports the agency's reading of the statute as

allowing it to require labels reflecting the origin of the actual animal from which a cut derives, rather than just the origin of any animals that may have been processed on the same day. We return to AMI's use of the "may have been" language in connection with its next argument—the only one in which it actually relies on "may have been."

AMI also contends that the entire production-step labeling regime—the rule's requirement that each animal have what AMI calls a "passport"—is inconsistent with the statute. First, AMI argues that the statute authorizes the agency only to require a list of the countries of origin, not a breakdown of which production step occurred where. But the statute ubiquitously invokes distinctions between three phases of production—where the animal from which a cut derives was born, raised, and slaughtered—so that the agency's choice to require labels linking each step to the relevant country appears reasonable.

Second, AMI contends the regulations are in direct conflict with what it views to be permissive language regarding Category B meat: a retailer "*may* designate the country of origin . . . as all of the countries in which the animal *may have been* born, raised, *or* slaughtered." § 1638a(a)(2)(B)(i) (emphases added). But the next subparagraph, § 1638a(a)(2)(B)(ii), reminds the reader that "nothing in [subparagraph (i)] alters the mandatory requirement to inform consumers of the country of origin of covered commodities under [§ 1638a(a)(1)]." With that in mind, it seems a stretch to read the "may" and "may have been" language as either rendering compliance with subsection B permissive (which even AMI seems not to advocate) or assuring producers that they may mingle their cattle in a such a way that they can only guess at a particular animal's migrations.

The agency does in fact allow leeway within category B.

> If an animal is raised in the United States as well as another country (or multiple countries), the raising occurring in the other country (or countries) may be omitted from the origin designation except if the animal was imported for immediate slaughter as defined in § 65.180 or where by doing so the muscle cut covered commodity would be designated as having a United States country of origin (e.g., "Born in Country X, Raised and Slaughtered in the United States" in lieu of "Born and Raised in Country X, Raised in Country Y, Raised and Slaughtered in the United States").

2013 rule, 78 Fed. Reg. at 31,385/3 (quoting 7 C.F.R. § 65.300(e) as amended by the 2013 rule). It thus assures flexibility, bounded mainly by precluding attribution entirely to the United States in cases where another country has also played a role in the three-step process. Despite AMI's two objections, AMS's interpretation of the statute is a reasonable one, and thus entitled to be upheld. See *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009); *Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183, 186 (D.C. Cir. 2013).

\* \* \*

AMI argues that compulsion to make the disclosures required by the 2013 rule violates its First Amendment rights. Its first step in this contention is that we should apply the general test for commercial speech formulated in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980), rather than that of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), a

standard that applies only to requirements that a commercial actor disclose factual and non-controversial information.

To begin, all parties agree that the rule involves commercial speech. In addition, it restricts speech only in the sense of requiring a disclosure, a prerequisite to invoking *Zauderer*. See *id*. at 650-51. Finally, the disclosure is purely factual and non-controversial. Unlike the challengers in *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001), or *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212, 1216-17 (D.C. Cir. 2012), AMI has not articulated an objection to the content of the message conveyed by the mandated speech. While it has objected to the term "slaughtered," it has not expressed any problem with the euphemism that the 2013 rule allows retailers to substitute—"harvested." 78 Fed. Reg. at 31,368/2.

AMI invokes *International Dairy Foods Association v. Amestoy*, 92 F.3d 67 (2d Cir. 1996), in which the court invalidated a Vermont statute requiring dairy manufacturers to disclose treatment of their cows with recombinant Bovine Somatotropin ("rBST"), a treatment that the U.S. Food and Drug Administration had found to have no significant effect on the milk. The government (although disagreeing with the case) suggests that the disclosure required there might have been seen by consumers "as a concession that the treatment might affect the quality of the milk," Resp. Br. at 31, and thus a more significant intrusion on First Amendment rights than the disclosure here. Although the government later seeks to justify the COOL requirements as possibly reassuring consumers who are anxious about potentially lax foreign practices, it seems a good deal less likely that consumers would draw negative hints from COOL information than from the required declarations about use of rBST. Reference to an apparently novel additive on milk cartons might well lead to an inference that the additive might have a dangerous effect,

whereas the appearance of countries of origin on packages of meat seems susceptible to quite benign inferences, including simply that the retailers take pride in identifying the source of their products. Accordingly, without resolving whether *Amestoy* was correctly decided, we find it distinguishable and (if correct) no obstacle to characterizing the disclosure here as purely factual and non-controversial.

In the case of a rule mandating such a disclosure, *Zauderer* found *Central Hudson* review—particularly its "least restrictive alternative" element—to be unnecessary. *Zauderer*, 471 U.S. at 651 & 651-52 n.14. Reasoning that commercial speech warrants protection mainly due to its information-producing function, the Supreme Court found that a commercial actor has only a "minimal" First Amendment interest in *not* providing purely factual information with which the actor does not disagree. *Id*. at 651. Such mandates do not violate an advertiser's First Amendment rights, it said, "as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id*.

AMI would read that formula as excluding all other justifying interests. Neither party has called our attention to any Supreme Court case extending *Zauderer* beyond mandates correcting deception, and we have found none. Other circuits, however, have extended it to, for example, government interests in telling buyers that mercury-containing light bulbs do contain mercury and may not be disposed of until steps have been taken to "ensure that [the mercury] does not become part of solid waste or wastewater," *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107 n.1 (2d Cir. 2001), and in alerting health benefit providers of the background decisions made by pharmacy benefit managers in their sales to the providers, *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 298-99, 308-10 (1st Cir. 2005) (Torruella, J.); *id*. at 316 (Boudin, C.J. & Dyk, J.) (giving *Zauderer* a very broad

reading); *id*. at 297-98 (per curiam) (explaining that the opinion of Chief Judge Boudin and Judge Dyk is controlling on the First Amendment issue). Although AMI's preferred analysis has an appealing symmetry (deception as the evil to be corrected, disclosure of purely factual and non-controversial information as the permissible cure), *Zauderer*'s characterization of the speaker's interest in opposing forced disclosure of such information as "minimal" seems inherently applicable beyond the problem of deception. See, e.g., *N.Y. Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009) (applying *Zauderer* to requirement that restaurant menus include calorie content information).

AMI argues, however, that our prior decisions in *Reynolds* and *National Association of Manufacturers v. NLRB*, 717 F.3d 947, 959 n.18 (D.C. Cir. 2013) ("*NAM*"), held that *Zauderer* applied *only* to disclosure mandates aimed at correcting deception. Indeed those opinions contain language quoting or echoing *Zauderer*'s reference to that specific interest. *Reynolds*, 696 F.3d at 1213; *NAM*, 717 F.3d at 959 n.18. We do not believe that these passages are correctly construed as holdings.

In the first place, both decisions pointed to features of those cases that render wholly inapplicable *Zauderer*'s characterization of the speaker's interest as "minimal": they rejected any idea that the mandated disclosures were of "purely factual and uncontroversial" information. *Reynolds*, 696 F.3d at 1212 (quoting *Zauderer*, 471 U.S. at 651). In *Reynolds* we found that the "inflammatory images and the provocatively-named hotline [could not] rationally be viewed as pure attempts to convey information to consumers." 696 F.3d at 1216-17. And in *NAM* we approvingly cited plaintiffs' description of the notice they were required to post "as one-sided, as favoring unionization," because the required notice made no mention of *other* worker rights that were

highly relevant to those required to be highlighted in the mandated notices. 717 F.3d at 958. In cases where there was clearly no basis for classifying the speaker's interest as minimal, it is hard to read the court's use of *Zauderer*'s language (which formulated the rule in terms of the facts before it, i.e., a mandate aimed at curing deception) as a holding that would preclude *Zauderer*'s application to mandates justified by other interests. Indeed, in *Reynolds*, in the very paragraph quoting *Zauderer*'s language about deception, we went on to incorporate language from *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1, 15-16 n.12 (1986), precluding *Zauderer*'s application to messages "biased against or . . . expressly contrary to the . . . views" of the entity subject to the mandate. 696 F.3d at 1213-14. *Reynolds*'s amalgamation of distinctions—the problem to be cured and the character of the mandate—militates against viewing it as a holding that the first alone was fatal to *Zauderer* review.

*NAM* in fact did not apply the First Amendment at all, but rested instead on 29 U.S.C. § 158(c), which, it carefully explained, goes significantly beyond merely incorporating the First Amendment. 717 F.3d at 955. In a footnote, to be sure, we addressed an NLRB footnote invoking *Zauderer*, and there we relied on the anti-deception purpose present in *Zauderer*. *Id*. at 959 n.18. But in a case turning on a statute, a footnote response to a party's footnote on a constitutional issue altogether lacks the earmarks of a constitutional holding.

Finding that *Zauderer* is best read as applying not only to mandates aimed at curing deception but also to ones for other purposes, and that neither *Reynolds* nor *NAM* represents a holding to the contrary, we adopt that reading, with the

incidental advantage of avoiding the creation of a split with the First and Second Circuits.[1]

What then are the government interests here? AMI argues that the rule merely satisfies consumers' curiosity. But we can see non-frivolous values advanced by the information. Obviously it enables a consumer to apply patriotic or protectionist criteria in the choice of meat. And it enables one who believes that United States practices and regulation are better at assuring food safety than those of other countries, or indeed the reverse, to act on that premise. See, e.g., 148 CONG. REC. H1538 (daily ed. Apr. 24, 2002) (statement of Rep. Hooley, co-sponsor of COOL amendment to 2002 Farm Bill) (asserting possible consumer interests in food safety and in favoring American producers); 149 CONG. REC. S14,117 (daily ed. Nov. 6, 2003) (statement of Sen. Johnson) (same). We cannot declare these goals so trivial or misguided as to fall below the threshold needed to justify the "minimal" intrusion on AMI's First Amendment interests. Thus AMI has failed to show a likelihood of success on the merits.

* * *

Besides the plaintiff's likelihood of success on the merits, grant of a preliminary injunction also turns on the existence of irreparable harm, the balance of equities, and the public interest. *Sherley*, 644 F.3d at 392. This circuit has repeatedly

---

[1] We recognize that reasonable judges may read *Reynolds* as holding that *Zauderer* can apply only where the government's interest is in correcting deception. Accordingly, we suggest that the full court hear this case *en banc* to resolve for the circuit whether, under *Zauderer*, government interests in addition to correcting deception can sustain a commercial speech mandate that compels firms to disclose purely factual and non-controversial information.

declined to take sides in a circuit split on the question of whether likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction. *Id*. at 393. We need not take sides today. Even if the sliding scale approach to assessing eligibility for preliminary injunctions survived *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), a plaintiff with a weak showing on the first factor would have to show that all three of the other factors "so much favor the plaintiffs that they need only have raised a 'serious legal question' on the merits." *Sherley*, 644 F.3d at 398. Given that plaintiffs' lack of success on the merits turns on the regulation's surviving *Zauderer*'s balancing test, it would be remarkable if we could find an abuse of discretion in the district court's finding against plaintiffs. There is, moreover, a public interest factor that we did not consider in our constitutional analysis, that of allowing the United States's effort to comply with the WTO ruling to take effect. We are clearly in a poor position to assess the effects of any noncompliance. Accordingly, the judgment of the district court is

*Affirmed*.