BROWN, Circuit Judge,
dissenting:
Throughout oral argument, AMI’s counsel repeatedly summarized the analytical options before the en banc court:
[T]he bottom line is if Central Hudson applies, [AMI] should prevail; if Zau-derer applies only to deception, [AMI] should prevail; if Zauderer applies only to consumer protection, health and safety, and deception, [AMI] should prevail. The only way [AMI does not] prevail is if this Court concludes that Zauderer applies to any interest, no matter how articulated, no matter how speculative.
Tr. of Oral Arg. at 39, Am. Meat. Inst. v. USDA, No. 13-5281 (D.C.Cir. May 19, 2014) (en banc). No doubt counsel thought stating such an outrageous proposition would be sufficient to refute it. But, astonishing as it may be to First Amendment scholars, the court today doubles down on that extraordinary result. The court holds “Zauderer ... reach[es] beyond problems of deception, sufficiently to encompass” factual and noncontroversial disclosure mandates aimed at providing more information to some consumers. Maj. Op. at 20. As a result, the fundamental First Amendment right not to be coerced or compelled to say what one would not say voluntarily is now demoted to a mere tautology: “[B]y acting ... through a reasonably crafted disclosure mandate, the government meets its burden of showing that the mandate advances its interest in making the ‘purely factual and uncontroversial information’ accessible to the recipients.” Maj. Op. at 26. In other words, a business owner no longer has a constitutionally protected right to refrain from speaking, as long as the government wants to use the company’s product to convey “purely factual and uncontroversial” information.
In so finding, the court today ignores the plain words of Zauderer’s text and disregards its historical context; both the text and history of the case emphasize the government’s unique interest in preventing commercial deception. By expanding Zauderer beyond deception, the court has now created a standard that is actually even more relaxed than rational basis re *38 view; essentially, the new standard for compelled commercial disclosures — or perhaps even all commercial speech restrictions — thus becomes rational basis review minus any legitimate justification. Instead of requiring the government to justify its regulations, the court searches sua sponte through the underlying statute’s legislative record, desperately seeking justifications while ignoring the agency’s actual rule-making record. Instead of relying on the precise interests articulated by the government in this case, the court tries to reclaim and rehabilitate rationales for the rule the agency has consistently discredited and denied: health and safety and domestic protectionism. Even rational basis review is less dismissive of constitutional guarantees.
The court’s ardent reliance on the legislative record to justify the rule, in lieu of the regulatory text itself or the rulemaking record presented by the government, is baffling. Though this case has a constitutional dimension, it challenges an agency rulemaking. Ordinarily, that means our review is limited to the record as the agency presented it, Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), and confined to considering the agency’s rationale as the agency articulated it, SEC v. Chenery, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). But, tossing aside longstanding administrative law principles is only the beginning of the lengths to which the court goes to bust the mainspring of commercial speech jurisprudence. What began as robust protection from government coercion has now been reduced to an eerie echo of a supermarket tabloid’s vacuous motto: the government may compel citizens to provide, against their will, whatever information “[i]nquir-ing minds want to know!”
I dissent.
I
Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), did not appear ex nihi-lo, nor can its analysis be read in vacuo. Giving attention to all parts of the whole, and read in its historical context, Zauderer’s meaning cannot rationally be disputed. Only by plucking phrases from the analysis shorn of all contextual clues and by pretending the case stands completely outside the historical evolution of the Supreme Court’s commercial speech doctrine can the court reach its disingenuous conclusions: (1) Zauderer “does not give a clear answer” to whether its principles apply more broadly to disclosures serving governmental interests beyond curing deception, Maj. Op. at 21-22; and (2) Zau-derer “gives little indication of what type of interest might suffice,” Maj. Op. at 23. If, as Jeremy Bentham once quipped, a fanciful argument may be dismissed as “nonsense upon stilts,” the court’s analysis in this case can best be described as delirium on a pogo stick.
A
The court’s erratic and idiosyncratic parsing of Zauderer’s text manages to create an impression of impenetrable opacity where the ordinary reader would find commendable clarity. Asserting that the “language with which Zauderer justified its approach ... sweeps far more broadly than the interest in remedying deception,” the court hinges its claims on just three scraps from Zauderer: a sentence about “material differences,” a sentence buried in a footnote, and the word “minimal.” See Maj. Op. at 22. Each plucked out of context.
As Chief Judge Garland explained to government counsel during oral argument, “If you’re going to rely on Zauderer, you’ve got to take the whole thing.” Tr. of *39 Oral Arg. at 51, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc). This is sound advice. Since the days of Chief Justice John Marshall, appellate courts have recognized the folly of lifting a general phrase or sentence out of an opinion and applying it to an entirely different context. See, e.g., Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821). The Supreme Court recently affirmed that wisdom in Arkansas Game & Fish Commission v. United States, — U.S. -, 133 S.Ct. 511, 184 L.Ed.2d 417 (2012), where the Court recalled Marshall’s “sage observation that ‘general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used,’ ” id. at 520 (quoting Cohens, 19 U.S. (6 Wheat.) at 399). Zauderer is triggered by its context and is incoherent when unmoored from the deception rationale.
In Zauderer, an attorney challenged Ohio’s restrictions on lawyer advertising after he was disciplined for certain allegedly misleading newspaper advertisements. Specifically,- when one advertisement promised clients would owe no legal fees in cases without a recovery, the disciplinary office complained the ad failed to follow regulations requiring disclosure that clients still may be liable for costs in unsuccessful claims. See Zauderer, 471 U.S. at 630-34, 105 S.Ct. 2265.
First, the Supreme Court clarified both that the First Amendment protects commercial speech, id. at 637-38, 105 S.Ct. 2265, and that it protects advertisers from compelled speech. Id. at 650-51, 105 S.Ct. 2265. However, the First Amendment does not shield deceptive, false, or fraudulent speech that proposes a commercial transaction. Id. at 638, 105 S.Ct. 2265. But, where that deceptive advertising could be cured by more speech, the government may choose between requiring disclosure and directly prohibiting the advertisement. Id. at 651, 105 S.Ct. 2265. While there are “material differences” between disclosure requirements and outright prohibitions, compelled speech “may be as violative of the First Amendment as [prohibited] speech,” and the government faces a heavy burden to justify involuntary affirmation (being forced to carry the government’s message). Id. at 650, 105 S.Ct. 2265. After reconfirming that the government may not attempt to “prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens” to conform to the state’s assumptions, id. at 651, 105 S.Ct. 2265, the Court then contrasted the imposition of orthodoxy — -prohibited by the First Amendment — with Ohio’s regulation of deceptive commercial advertising. When the purpose of compelling factual information is to cure deception, the advertiser’s “constitutionally protected interest ... is minimal.” Id. To avoid any possible confusion, the court succinctly summarized: “[W]e hold that an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” Id. (emphasis added).
Crucial to the Court’s analysis was not just the difference between disclosure and prohibition; it was also the difference between disclosure in advertising and that advertisement’s outright prohibition, given the state’s prerogative to prohibit misleading commercial speech. The Court was absolutely clear: “[B]eeause disclosure requirements trench much more narrowly on an advertiser’s interests than do flat prohibitions on speech, warnings or disclaimers might be appropriately required in order to dissipate the possibility of consumer confusion or deception.” Id. (emphasis added). In short, the state’s option to require a curative disclosure cannot be disconnected from its right to entirely prohibit deceptive, fraudulent, or misleading *40 commercial speech. Requiring an advertiser to provide “somewhat more information than they might otherwise be inclined to present,” id. at 650, 105 S.Ct. 2265 (emphasis added), is thus constitutionally permissible when the government’s available alternative is to completely ban that deceptive speech. Nowhere does Zauderer claim a commercial speaker can be forced to speak factual and noncontroversial information in the first instance. Instead, the text emphasizes the interests of advertisers, i.e., those who have already spoken. See, e.g., id. at 651, 105 S.Ct. 2265 (noting minimal constitutionally protected interest in “not providing any particular factual information in ... advertising ”) (emphasis added).[1]
Thus, even when the advertiser makes affirmative claims and the basis for a curative disclosure is self-evident, the advertiser still retains minimal First Amendment protections. Conversely, when the government is not curing deception, constitutional protections remain robust and undiminished. That the compelled information must be factual and noncontroversial is part of the government’s burden. This characterization is not a trigger that transforms every seller’s packaging into the government’s billboard.
Inexplicably, the court now upends the precise constitutional hierarchy outlined in Zauderer by ignoring the clear linkage between advertising, deception, and the state interest in curing that deception, which forms the core of the Supreme Court’s reasoning.
B
By parsing Zauderer in such a piecemeal fashion, this court robs the decision of its internal consistency and strips it of any historical context. The Framers resisted adding a Bill of Rights to the Constitution because they feared the elucidation of some rights would overshadow the telos inherent in the Constitution as a whole. The Constitution of liberty they conceived was premised on the natural law and conceded the immanence of the first principle of that law — that an adult human being, as a free moral agent, cannot be coerced without good reason. At the same time, they understood James Wilson’s observation that no one ever had a natural right to do wrong. This is precisely the balance the Supreme Court struck in its early opinions acknowledging protection for commercial speech.
When the Supreme Court extended formal constitutional protection to commercial speech, it emphasized that false' or misleading commercial speech remained unprotected. See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 772 & n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Granting constitutional protection to commercial speech did not preclude regulation of false or -deceptive advertising; accordingly, the Court anticipated that the government might “require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive.” Id. (emphasis added). Sanctioning disclosure was not an exception to the otherwise stringent protections of the First Amendment; rather; it was the Court’s acknowledgement that sellers of products had no right under our constitutional regime to wrongly deceive consumers. Thus, the Court made a sensible distinction between expression of opinion (which is protected even if it is incorrect) *41 and expression of commercial fact, for which the state can require accuracy.
The court disregards the Supreme Court’s extraordinarily consistent jurisprudence in this area, from Virginia Board to Zauderer through the present day: the government may regulate commercial speech to avoid misleading or confusing consumers. While broad bans on nonmisleading commercial speech were immediately suspect, the Court repeatedly affirmed the narrow niche occupied by actual, inherently, and potentially deceptive speech subject to government regulation. See, e.g., Linmark Assocs., Inc. v. Willingboro Twp., 481 U.S. 85, 98, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (remarking “laws requiring [false and misleading] signs to appear in such a form, or include such additional information as is necessary to prevent their being deceptive ... would raise very different constitutional questions” than the unconstitutional ban on all “for sale” signs); Bates v. State Bar of Ariz., 433 U.S. 350, 375, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (“[T]he bar retains the power to correct omissions that have the effect of presenting an inaccurate pic-ture_”); Bates, 433 U.S. at 383-84, 97 S.Ct. 2691 (noting certain claims “not susceptible of measurement or verification ... may be so likely to be misleading as to warrant restriction”); Bates, 433 U.S. at 383-84, 97 S.Ct. 2691 (“We do not foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required of [an advertisement] so as to assure that the consumer is not misled.”); In re R.M.J., 455 U.S. 191, 200-01, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (reiterating Bates’s conclusion that warnings or disclaimers “might be appropriately required ... in order to dissipate the possibility of consumer confusion or deception”); In re 455 U.S. at 200 n. 11, 102 S.Ct. 929 (noting the governmental entity “could require disclaimers or explanations to avoid false hopes”); In re R.M.J., 455 U.S. at 202, 102 S.Ct. 929 (“[Regulation ... [is] permissible where the particular advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive.”); Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (“In light of the greater potential for deception or confusion in the context of certain advertising messages, content-based restrictions on commercial speech may be permissible.”).
Thus, when the Court was confronted for the first time, in Zauderer, with the constitutionality of a disclosure requirement, it studied and relied on this prior commercial speech jurisprudence concerning deception to reach its ultimate holding. See Zauderer, 471 U.S. at 651, 105 S.Ct. 2265 (“[I]n virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser’s interests than do flat prohibitions on speech, warnings or disclaimers might be appropriately required in order to dissipate the possibility of consumer confusion and deception.” (emphasis added) (citing cases)); see also id. at 646, 105 S.Ct. 2265 (“Our recent decisions involving commercial speech have been grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful.” (emphasis added)). Instead of viewing Zauderer in its proper context, the court claims Zau-derer ’s deception-specific language is “simply descriptive of the circumstances to which the Court applied its new rule.” Maj. Op. at 22. But this conclusion is belied by the cases preceding Zauderer as well as the cases following it.
*42 If, when the opinion was issued, there was any doubt Zauderer only applied to mandates targeting deception, that doubt dissipates given the Supreme Court’s dogged adherence to this singular rationale. See, e.g., Peel v. Attorney Registration & Disciplinary Comm’n of Ill., 496 U.S. 91, 110, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990) (“To the extent that potentially misleading statements of private certification or specialization could confuse consumers, a State might consider ... requiring a disclaimer about the certifying organization or the standards of a specialty.”); Ibanez v. Fla. Dep’t of Bus. & Prof'l Regulation, 512 U.S. 136, 146-47, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994) (noting the hypothetical possibility that a different disclaimer “might serve as an appropriately tailored check against deception or confusion”); Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 490-91, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (Souter, J., dissenting) (“Zauderer thereby reaffirmed a longstanding preference for disclosure requirements over outright bans, as more narrowly tailored cures for the potential of commercial messages to mislead by saying too little. But however long the pedigree of such mandates may be, and however broad the government’s authority to impose them, Zauderer carries no authority for a mandate unrelated to the interest in avoiding misleading or incomplete commercial messages.” (citations omitted)); United States v. United Foods, Inc., 533 U.S. 405, 416, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) (“There is no suggestion in the case now before us that the mandatory assessments imposed to require one group of private persons to pay for speech by others are somehow necessary to make voluntary advertisements nonmisleading for consumers.”); Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 250, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010) (upholding disclosure requirement as “reasonably related to the State’s interest in preventing deception”)[2]; see also Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 576, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (Thomas, J., concurring in part and concurring in the judgment) (“[I]t is more ‘appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive.’ Whatever the validity of this reasoning, it is limited to the peculiarly commercial harms that commercial speech can threaten — ie., the risk of deceptive or misleading advertising.” (citations omitted)); Borgner v. Fla. Bd. of Dentistry, 537 U.S. 1080, 123 S.Ct. 688, 154 L.Ed.2d 580 (2002) (Thomas, J., dissenting to denial of certiorari, joined by Ginsburg, J.) (“If the disclaimer creates confusion rather than eliminating it, the only possible constitutional justification for this speech regulation is defeated.”).
In R.J. Reynolds, a panel of this court followed Zauderer’s text to its logical conclusion: “[B]y its own terms, Zauderer’s holding is limited to cases in which disclosure requirements are ‘reasonably related to the State’s interest in preventing deception of consumers.’ ” R.J. Reynolds Tobacco Co. v. FDA 696 F.3d 1205, 1213 (D.C.Cir.2012) (quoting Zauderer, 471 U.S. at 651, 105 S.Ct. 2265). This court then went on to examine Supreme Court jurisprudence following Zauderer — including Milavetz — to reaffirm that conclusion. The original AMI panel was wrong to eon- *43 tradiet R.J. Reynolds, and the en banc court today is wrong to overrule it.
Thus, not only did the Supreme Court recognize Zauderer’s clarity (and limitations), so too did this court. In fact, even the government — in previous filings in this very case — recognized the clear import of Zauderer. See, e.g., Defs.’ Opp’n to Pis.’ Mot. for Prelim. Inj. at 32, Am. Meat Inst. v. USDA, 968 F.Supp.2d 38 (D.D.C.2013) (No. 13-CV-1033), ECF No. 30, reprinted in J.A. 999 (“In order for Zauderer to apply to a commercial speech regulation, the regulation must be aimed at correcting misleading speech and preventing deception of consumers.” (citing Milavetz, 559 U.S. at 249-50, 130 S.Ct. 1324)). But see Tr. of Oral Arg. at 43, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc) (Government: “[I]t’s simply not a proper reading of [Zauderer ] to describe it as a case about combatting deception.”).
The clear trajectory of the Supreme Court’s jurisprudence is toward greater protection for commercial speech, not less. See, e.g., Milavetz, 559 U.S. at 255, 130 S.Ct. 1324 (Thomas, J., concurring in part and concurring in the judgment) (“I would be willing to reexamine Zauderer and its progeny in an appropriate case to determine whether these precedents provide sufficient First Amendment protection against government-mandated disclosures.”); Sorrell v. IMS Health, Inc., — U.S. -, 131 S.Ct. 2653, 2667-72, 180 L.Ed.2d 544 (2011) (striking down law burdening commercial speech under intermediate scrutiny); Nike, Inc. v. Kasky, 539 U.S. 654, 676, 123 S.Ct. 2554, 156 L.Ed.2d 580 (2003) (Breyer, J., dissenting) (arguing for heightened scrutiny to apply to commercial speech when it involves a matter of public concern); Lorillard Tobacco Co., 533 U.S. at 576, 121 S.Ct. 2404 (Thomas, J., concurring in part and concurring in the judgment) (calling for content-discriminatory regulation unrelated to the preservation of the fair-bargaining process to be subjected to strict scrutiny). For that reason, the government’s litigating position in this case, which this court adopts, has been particularly troubling. The government has' repeatedly attempted to focus the court on Appellants’ interests, instead of its own. See Gov’t Supp’l Br. at 13—15; Tr. of Oral Arg. at 40, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc). In fact, the government does not even mention its own interest in burdening First Amendment rights until the very last page of its brief, and even then, confines the interest to one sentence that cites the original AMI Panel’s opinion, instead of the record. See Gov’t Supp’l Br. at 20. This is backwards; the heart of the First Amendment analysis begins with the government’s justification for interfering with such a fundamental right. See, e.g., Texas v. Johnson, 491 U.S. 397, 406-07, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (“It is, in short, ... the governmental interest at stake that helps to determine whether a restriction on ... expression is valid.”).
The government even goes so far as to argue the “applicability of the Zauderer standard does not depend upon the government’s justification for the required disclosure [and] [i]nstead ... [is] premised on” the commercial actor’s limited interests. Gov’t Supp’l Br. at 5; see also id. at 7 (“But the nature of the government’s reason for requiring disclosure does not affect whether the Zauderer standard applies.”). And at oral argument, the government — before correction by the Chief Judge — essentially argued compelled commercial disclosures implicate no First Amendment interests at all. See Tr. of Oral Arg. at 50, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc) (arguing the analysis might be different if “the actual First Amendment interest might start to crop up on the other side” (emphasis added)); id. at 50-51 (stating *44 government is “not interested in ... quibbling” as to whether Appellants have a First Amendment interest); see also Gov’t Supp’l Br. at 11 (“[Disclosure requirements are subject to First Amendment scrutiny only insofar as they threaten to chill protected speech.”).
Several members of this court seemed to find these arguments troubling. See Tr. of Oral Arg. at 40-41, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc) (Judge Kavanaugh: “This is a First Amendment case. We usually don’t start that way[. We] usually start by asking what’s the government’s interest in burdening the speaker or the speech.”); id. at 50 (Judge Brown: “You don’t think that compelling speech is a First Amendment interest?”); id. (Judge Kavanaugh: “[Y]ou were suggesting that they were outside — there was no First Amendment issue at all here.”); id. at 51 (Chief Judge Garland: “[I]t’s not quibbling. The Supreme Court in Footnote 14 in Zauderer ... doesn’t say [the First Amendment interests implicated by disclosure requirements] [a]re nonexistent. Is the government’s position that they’re nonexistent?”). Yet, remarkably, the court today agrees with the government that the First Amendment no longer matters here, as long as a court can agree the compelled information is factual and uncontroversial.
II
Despite the clear protections granted to commercial speech since 1972, the court now invents a First Amendment standard that provides even less protection than rational basis review. To say this result is anomalous is an understatement. No one has argued in this case that the government can never compel the sellers of products to give notice to consumers. The only question here is who bears the burden of justification and what level of interest is sufficient. And when we are dealing with fundamental First Amendment protections, as we are here, the burden is on the government, and it is the government that must assert substantial interests. See Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (“[T]he State bears the burden of justifying its [commercial speech] restrictions.”) Curiously, the court disagrees, salvaging interests the government disclaimed to uphold a regulation the government never adequately justified. Compelled disclosure, says the court, can “rest on other suppositions as opposed to the precise interests put forward by the State.” Maj. Op. at 46.
A
Although we have sometimes characterized the Zauderer standard as similar to rational basis review, see R.J. Reynolds, 696 F.3d at 1212, even the court acknowledges it is essentially an application of Central Hudson’s, intermediate scrutiny. See Maj. Op. at 26-27; Kavanaugh Op. at 33-34. And, if Zauderer’s import is clear when read alone, and pellucid when its analysis is placed in historical context, it is even more unmistakable when seen as a specialized subset of Central Hudson’s intermediate scrutiny.
Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), clarifies the intermediate scrutiny standard applicable to commercial speech restrictions: the government’s asserted interest must be substantial; the regulation must directly advance that interest; and the regulation must be no more extensive than is necessary to serve that interest, id. at 564, 100 S.Ct. 2343. This standard applies not only to speech restrictions but also to compelled speech; the right not to speak has been protected commercially just as it has been protected generally. See, e.g., United Foods, Inc., *45 533 U.S. at 410, 121 S.Ct. 2384 (protecting right against compelled speech, even if commercial speech is ordinarily subject to lesser safeguards); cf. Riley v. Nat'l Fed’n of the Blind of N.C., Inc., 487 U.S. 781, 796-97, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (“[I]n the context of protected speech, the difference [between compelled speech and compelled silence] is without constitutional significance, for the First Amendment guarantees ‘freedom of speech,’ a term necessarily comprising the decision of both what to say and what not to say.”). Thus, the general rule is that government may not compel speech without satisfying at least a substantial burden: intermediate scrutiny. See Riley, 487 U.S. at 796-97, 108 S.Ct. 2667. And when the government attempts to compel individuals to express a certain viewpoint, the government’s action is subject to an even higher burden: strict scrutiny. See Wooley v. Maynard, 430 U.S. 705, 714-15, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm’n of Cal., 475 U.S. 1, 12-15, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986); Zauderer, 471 U.S. at 650, 105 S.Ct. 2265.
Zauderer’s narrowly crafted exception to this rule does not offer a dispensation from Central Hudson’s intermediate scrutiny. Rather the government’s burden under intermediate scrutiny is effectively met when the government commands purely factual and noncontroversial disclosures to prevent deceptive advertising.[3] See Zauderer, 471 U.S. at 651, 105 S.Ct. 2265. Zauderer is, in essence, a shortcut, “where several of Central Hudson’s elements have already been established.” AMI Supp’l Br. at 9.
To illustrate: Under Central Hudson, the government must first assert a substantial interest. Preventing inherent or actual deception in commercial advertising will always be such a substantial interest, so Zauderer satisfies the first element. Next, when a government’s disclosure mandate is reasonably related to its deception interest — as Zauderer requires — we can be assured the disclosure will directly advance that interest; in other words, a reasonably related curative disclosure will necessarily make the deceptive advertisement less misleading. Finally, a disclosure requirement will be less restrictive than an outright ban, or no more extensive than necessary to cure the deception.
When the government’s interest is not in curing deceptive advertising, however, Zauderer does not apply. The commercial speech “may be restricted only in the service of a substantial ... interest” articulated by the government, and “only through means that directly advance that interest.” Zauderer, 471 U.S. at 638, 105 S.Ct. 2265 (citing Central Hudson, 447 U.S. at 566, 100 S.Ct. 2343); see also In re R.M.J., 455 U.S. at 203, 102 S.Ct. 929 (noting when a statement is not misleading in any way— real, inherent, or potential — the Court mandates that the state’s authority be subject to serving a “substantial interest,” interfering with speech only in proportion to the interest served, and being narrowly drawn). Central Hudson — without any shortcuts — applies to disclosures that target interests other than deception.
Unsatisfied with eviscerating Zauderer ’s protective limits, the court proceeds to lay the groundwork to disembowel Central Hudson as well. See, e.g., Maj. Op. at 25-26 (“Zauderer’s method of evaluating fit differs in wording [from Central Hudson], though perhaps not significantly in substance.... ”). By holding the amorphous interests in today’s case to be “sub *46 stantial” (and questioning whether any governmental interest could fail to be substantial, except those already found to be trivial, see Maj. Op. at 22-23), the court effectively absolves the government of any burden. Any interest that is not “trivial” will do.
B
Although the court declines to “consider to what extent a mandate reviewed under Zauderer can rest on other suppositions as opposed to the precise interests put forward by the State,” Maj. Op. at 25, it nonetheless relies on interests the agency never asserted and even denied were rationales for the rule. This takes the evil of post hoc rationalization to a whole new level. And the court forgets that it is assessing the propriety of administrative action, when a reviewing court is limited to the administrative record and must judge the rule “solely by the grounds invoked by the agency.” Chenery, 332 U.S. at 196, 67 S.Ct. 1575; see also Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (“It is well-established that an agency’s action must be upheld, if at all, on the basis articulated by the agency itself.”). If the grounds asserted by the agency “are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.” Chenery, 332 U.S. at 196, 67 S.Ct. 1575. The court violates this bedrock principle of administrative law today.
The court asserts “AMI makes no claim that the agency’s exercises of its discretion are of constitutional moment....” Maj. Op. at 25. This is more of a non sequitur than an explanation.[4] The litigants have assumed the usual rules applied. The court has changed the game, invoking exceptions which played no role in the panel decision. But here the court’s exceptions only prove the wisdom of the rules. First, that the statute itself mandates a course of action is of no moment. This is often the case. See, e.g., R.J. Reynolds, 696 F.3d at 1208-09. Moreover, Chenery applies with equal force to statutory interpretation. N. Air Cargo v. U.S. Postal Serv., 674 F.3d 852, 860 (D.C.Cir.2012). Second, the “statutorily compelled” exception assumes the agency decision — even if premised on a debatable or erroneous ground — would be unchanged by the “useless formality” of court review. Henry J. Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 2 Duke L.J. 199, 210 (1969). But the agency’s specific implementation is not compelled by the statute. Indeed, this is the agency’s second try.
Likewise, if the court means to rely on the background presumption of the constitutionality of Congressional legislation, that presumption is consistent with rational basis review, Katzenbach v. Morgan, 384 U.S. 641, 653, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), but clearly improper where heightened constitutional scrutiny is demanded, see, e.g., Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664-67, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Heightened scrutiny requires considerable and specific Congressional findings to establish that the government’s asserted interest is substantial. See id. at 666, 114 S.Ct. 2445. Thus, even accepting the *47 court’s doubtful assertion that it can completely ignore the rulemaking record in this case, the government’s burden could never be met by the “hypothesized justifications” based on a few scattered comments in the legislative record. Thompson v. W. States Med. Ctr., 535 U.S. 357, 373, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002); see also Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 89, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (noting that the government’s burden under heightened scrutiny is not met where the legislative record consists “almost entirely of isolated sentences clipped from floor debates and legislative reports”).
In any event, the mere presence of substantial Congressional findings is not alone sufficient. The Central Hudson test requires “the Government not only to identify specifically a substantial interest to be achieved ... but also to prove that the regulation directly advances that interest and is not more extensive than is necessary to serve that interest.” Thompson, 535 U.S. at 374, 122 S.Ct. 1497. The “congruence and proportionality” test announced in Central Hudson — and applied in other heightened scrutiny cases — is not satisfied where the legislative record offers only “scant support” for Congress’s conclusions. See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 645-47, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999).
The government’s only asserted interest for the rule throughout this litigation— after abandoning its half-hearted post hoc deception rationale — has been a consistently vague one: “The government’s interest is in providing consumers with information that those consumers can use to make choices about the food that they will ... purchase and serve to their families or eat themselves.” Tr. of Oral Arg. at 41, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc); see also Gov’t Supp’l Br. at 20 (referring to “the benefit of allowing customers to know the country of origin of their food” as the government interest); Mandatory Country of Origin Labeling, 74 Fed.Reg. 2658, 2683 (Jan. 15, 2009) [hereinafter “2009 Rule”] (noting “interest by some consumers in the country of origin of food” (emphasis added)). Yet the government has never explained precisely why origin information assists with customer preferences, only suggesting “the production steps in each country may embody latent (hidden or unobservable) attributes, which may be important to individual consumers.” Mandatory Country of Origin Labeling, 78 Fed.Reg. 31,367, 31,377 (May 24, 2013) [hereinafter “2013 Rule”] (emphasis added). The government never suggests, explains, or supports what those attributes might be. More importantly, the government never explains why coerced speech is the only solution.
The agency’s stated ambiguous and amorphous interest in giving consumers more information is undoubtedly insufficient to survive even under an expanded-Zauderer regime. See Int’l Dairy Foods Ass’n v. Amestoy, 92 F.3d 67, 74 (2d Cir.1996) (holding “consumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement ... in a commercial context”); accord Nat'l Elec. Mfrs. Ass’n v. Sorrell, 272 F.3d 104, 115 n. 6 (2d Cir.2001); see also Kavanaugh Op. at 3 (conceding “it is plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information”). By applying Zauderer to this case, the court invents a new standard that, in practice, is even more relaxed than rational basis review. Now, commercial disclosure mandates are subject only to rational basis review minus any legitimate justification. See Tr. of Oral Arg. at 85, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc) (“[I]f you accept *48 the panel’s ruling here, this is rational basis minus, and when you are talking about where speech is compelled, you have to apply some standard other than that there be any interest in the air.”). Undaunted, the court borrows the res ipsa loquitur doctrine from tort law to conclude the “self-evident tendency of a disclosure mandate to assure that recipients get the mandated information,” Maj. Op. at 26, satisfies the government’s “burden of showing that [compelled disclosure] advances its interest in making the ... information accessible to the recipients,” Maj. Op. at 26. Seriously? With logic like this, who needs a Ministry of Truth?[5] However, should this fog of airy circumlocutions prove too frustratingly elusive, the government need not justify its actions at all. As noted, the court is willing to change the rules so it may selectively rely on the legislative record of the underlying statute, while disregarding the agency rulemaking challenged in this case. For the court to sua sponte rely on legislative history instead of either the regulatory text or the rulemaking record reverses the poles of administrative law. See Tr. of Oral Arg. at 38, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc) (“The two interests that the panel identified are both interests that the government has expressly disclaimed. It would be a remarkable thing for this Court to apply Zauderer in those circumstances given the government’s expressed disclaiming of those interests.”); see also Alex Kozinski, Should Reading Legislative History Be an Impeachable Offense?, 31 Suffouk U.L.Rev. 807, 812-13 (1998) (noting, among other things, that legislative history “is often contradictory, giving courts a chance to pick and choose those bits which support the result the judges want to reach”); Patricia M. Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L.Rev. 195, 214 (1983) (“[Cjiting legislative history is still ... akin to looking over a crowd and picking out your friends.”).
The result is a jumble, a messy amalgam of standards, legislative history, and administrative procedure. The court is so committed to upholding this rule that it concludes “several aspects of the government’s interest in country-of-origin labeling for food combine to make the interest substantial: the context and long history of country-of-origin disclosures to enable consumers to choose American-made products; the demonstrated consumer interest in extending country-of-origin labeling to food products; and the individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak.” Maj. Op. at 23. On inspection, each of these “aspects,” upon which the court so heavily leans, is foreclosed by history, governmental concession, and the record.
i
Contrary to the court’s assertions, the “long history” of country-of-origin labeling cannot support the government’s interest here. The court claims the rule’s “historical pedigree ... lifts it well above ‘idle curiosity.’ ” Maj. Op. at 23. However, in the First Amendment context, which has been steadily evolving since the late 1800s, history is not “telling,” Maj. Op. at 23-24; rather, it is an especially poor substitute for reasoned judgment. The Supreme Court’s general reluctance to accept any free speech claims at the time country-of-origin labeling began certainly bears on the issue. See David M. Rabbant, The First Amendment in Its Forgotten Years, 90 Yale L.J. 514, 523 (1981) (“The overwhelming majority of prewar decisions in *49 all jurisdictions rejected free speech claims, often by ignoring their existence.”).
Modern “commercial speech” doctrine did not begin until the 1970s, when the Supreme Court formally extended First Amendment protection to commercial speech. See Va. State Bd. of Pharmacy, 425 U.S. at 762, 96 S.Ct. 1817. That “Congress has been imposing [country-of-origin] mandates since 1890,” Maj. Op. at 23, eighty-six years before commercial speech received explicit protection, thus tells us very little about the practice’s constitutionality. The Court’s terminology in these early years was something of a self-fulfilling prophecy; what we now call “commercial speech,” the court simply referred to as “commercial advertising” or some other business activity. See, e.g., Valentine v. Chrestensen, 316 U.S. 52, 54, 62 S.Ct. 920, 86 L.Ed. 1262 (1942) (denying protection for “purely commercial advertising”); Halter v. Nebraska, 205 U.S. 34, 41, 45, 27 S.Ct. 419, 51 L.Ed. 696 (1907) (referring to “mere advertisement”); see also Alex Ko-zinski & Stuart Banner, Response, The Anti-History and Pre-History of Commercial Speech, 71 Tex. L.Rev. 747, 756-57 (1993) (“But before 1971, no judge thought of the thing as commercial speech — they called it ‘advertising’ ..., or ‘soliciting and canvassing,’ or some such term that denoted a business activity rather than a form of expression.”). This linguistic choice not only reflected the court’s underlying thoughts and assumptions (i.e., that advertising was permissibly regulated as business conduct) but also likely influenced the litigating positions of parties. Litigants rarely raised First Amendment challenges to advertising restrictions — instead making substantive due process arguments by asserting restrictions affected their business rights.
For example, in 1907, when faced with the constitutional validity of a state law criminalizing the use of an American flag emblem on labels, the litigants and the Court “ignored potential free speech claims.” Rabbant, supra at 531; see Halter, 205 U.S. at 38, 27 S.Ct. 419; Kozinski & Banner, supra at 763 (“No speech-related claim was made in Halter, probably ... because the litigants didn’t conceive of bottle-labeling as speech.”). Rather, the defendants attacked the statute as repugnant to the Equal Protection and Due Process Clauses, challenges rejected by the Court. See Halter, 205 U.S. at 39, 27 S.Ct. 419; see also Rabbant, supra at 531 n. 69. When the Court repeatedly referred to “mere advertisement,” Halter, 205 U.S. at 41, 45, 27 S.Ct. 419, it did so in the context of analyzing substantive due process and property rights, not speech.
When at last the Supreme Court formally addressed the protection of “advertising” (again, its term), it noted, without citation, it was “clear that the Constitution imposes no such restraint on government as respects purely commercial advertising.” Chrestensen, 316 U.S. at 54, 62 S.Ct. 920. “[T]his suggests that in 1942, the Justices considered the question whether the First Amendment has any application to advertising to be ... easily resolved and not very important.” Kozinski & Banner, supra at 758. One reason for this certainty again may have been the concept that advertising was more a business activity— subject to the “then-recently-adopted deferential economic substantive due process jurisprudence” — than speech. See id. Again, giv.en both Christensen and the prevailing view that advertising was conduct and not speech, the court’s citation to early labeling regimes tells us nothing useful.
Additionally, the early years of free speech jurisprudence saw laws routinely upheld that by today’s standards clearly interfere with commercial speech. See, e.g., Ex parte Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93 (1892); Ex parte *50 Jackson, 96 U.S. 727, 24 L.Ed. 877 (1877). In the postal cases of the late 1800s, the Supreme Court focused on the right of Congress to exclude injurious matters from the mail, including materials advertising lotteries and other vices. The mailing prohibition’s long history (since 1866!) — and the Court’s decisions affirming it — did not stop the Supreme Court from later rejecting the laws under the new commercial speech doctrine. See, e.g., Bolger, 463 U.S. at 72-76, 103 S.Ct. 2875.
Furthermore, this court’s reliance on Burson v. Freeman, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), to support its history rationale is inapposite. First, Burson was a “rare case,” id. at 211, 112 S.Ct. 1846, that involved a reconciliation of two competing fundamental rights — the right to engage in political discourse and the right to vote, “a right at the heart of our democracy,” id. at 198, 112 S.Ct. 1846. But Burson relied on history only to “demonstrate the necessity of restricted areas in and around polling places.” Id. at 200, 112 S.Ct. 1846. And, like Zauderer, Burson approves a limited intrusion on protected activity to prevent fraud. Id. at 199, 112 S.Ct. 1846. Voter intimidation and election fraud were historically rampant, but the 1890 restrictions had ameliorated these problems. Id. at 207-08, 112 S.Ct. 1846. In contrast, this court invokes the long history of country-of-origin labeling laws to argue the necessity of the government’s intrusion is self-evident. Burson simply does not stand for the proposition that a time-tested consensus can be a proxy for the substantiality of the government’s interest in the First Amendment context. If that were true, the commercial speech doctrine would never have developed at all.
Similarly, Edenfield v. Fane, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), contradicts this court’s actions and its analysis. In Edenfield, the Supreme Court emphasized the need to “identify with care the interests the State itself asserts” and noted “[u]nlike rational-basis review, the Central Hudson standard does not permit us to supplant the precise interests put forward by the State with other suppositions.” Id. at 768, 113 S.Ct. 1792. But that is exactly what the court does here.
ii
The court concludes protectionism or patriotism is the true motive of the challenged eountry-of-origin labeling scheme, even if it is only acknowledged with a sly wink by the government. See Kavanaugh Op. at 32 (“[T]he Executive Branch has refrained during this litigation from expressly articulating its ... interest in supporting American farmers and ranchers in order to justify this law, apparently because of the international repercussions that might ensue.”). The court assumes— perhaps correctly — that absent the constraints of various trade treaties, Congress would have an interest in promoting American products. See Maj. Op. at 23 (noting origin labeling “enable[s] consumers to choose American-made products”); Kavanaugh Op. at 33 (asserting the government “has a substantial interest in this case in supporting American farmers and ranchers against their foreign competitors”). But, that interest would constitute a substantial justification for coercing speech only if the government had actually asserted it, and if voluntary action and direct government speech were obviously inadequate. Significantly, the court ignores the agency’s disclaimers in this case. Not only has the agency failed to raise or support any protectionist motive, it has, in fact, consistently denied one. See, e.g., 2013 Rule, 78 Fed.Reg. at 31,376 (“The availability of [country-of-origin labeling] information does not imply that there will necessarily be any change in aggregate *51 consumer demand or in demand for products of one origin versus others.”); 2009 Rule, 74 Fed.Reg. at 2670 (“[W]hile some U.S. producers may hope to receive benefits from the [country-of-origin labeling] program for products of U.S. origin, the purpose of the ... program is to provide consumers with origin information.” (emphasis added)); Mandatory Country of Origin Labeling, 68 Fed.Reg. 61,944, 61,955 (Oct. 30, 2003) [hereinafter “2003 Proposed Rule”] (“We find little evidence to support the notion that consumers’ stated preferences for country of origin labeling will lead to increased demands for covered commodities bearing the U.S.-origin label.”); 68 Fed.Reg. at 61,956 (“The lack of participation in government-provided programs for labeling products of U.S. origin provides evidence that consumers do not have a strong preference for country of origin labeling.”); 68 Fed.Reg. at 61,956 (“The results from ... surveys indicate that the number of consumers with strong preferences for U.S.-origin labeled products is not sufficient for U.S. producers to benefit from labeling.”); accord Tr. of Oral Arg. at 53, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc) (explaining government is not asserting an interest in helping American ranchers).
iii
The court credits the government with acting sub silentio on the belief that food products produced wholly in the USA are safer than those produced even partly outside the USA. See Maj. Op. at 23 (asserting interest in “individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak”); id. at 24 (“Supporting members of Congress identified the statute’s purpose as enabling customers to make informed choices based on characteristics of the products they wish to purchase, including United States supervision of the entire production process for health and hygiene.”) Again, not only has the government failed to raise or support any motive in consumer health and safety, it has, in fact, consistently eschewed that interest as supporting the rule. See, e.g., Mandatory Country of Origin Labeling, 78 Fed.Reg. 31,367, 31,372 (May 24, 2013) (noting the country-of-origin labeling program “is not food safety related”); 2009 Rule, 74 Fed. Reg. at 2679 (“[T]he [country-of-origin labeling] program is neither a food safety [n]or traceability program, but rather a consumer information program. Food products, both imported and domestic, must meet the food safety standards of the FDA and [other agencies]. Food safety and traceability are not the stated intent of the rule-”); 74 Fed.Reg. at 2683 (rejecting commenters’ suggestions that country-of-origin labeling would provide “food safety benefits to consumers” because the program “does not address food safety issues”); 2003 Proposed Rule, 68 Fed.Reg. at 61,956 (noting that although some evidence suggests “consumers may use country of origin labeling as a proxy for food safety information,” country of original labeling “does not provide valid information regarding food safety”). This undercuts the court’s claim that “it seems reasonable for Congress to anticipate that many consumers will prefer food that had been continuously under a particular government’s direct scrutiny.” Maj. Op. at 24.
Even the anecdotes in the legislative record do not, as the court contends, “broadly suggest[ ] the utility of [country-of-origin] disclosures in the event of any disease outbreak known to have a specific country of origin, foreign or domestic.” Maj. Op. at 24. Rather, the Agency also discredited this very purpose: “Appropriate preventative measures and effective mechanisms to recall products in the event of contamination incidents are the means used to protect the health of the consum *52 ing public_” 2009 Rule, 74 FecLReg. at 2683; see id. at 2679 (rejecting eommen-ters’ suggestions that the origin labeling program is “critical to respond to outbreaks of food borne illness”); see also Kavanaugh Op. at 31 (“[T]he Government cannot advance a traditional ... health ... or safety interest in this case because a eountry-of-origin disclosure requirement obviously does not serve [that] interest[ The court invokes a health and safety interest — even over the government’s adamant objections — because health and safety will usually qualify as a substantial interest. But the court forgets that the interest must at least be one asserted by the government — and certainly not one rejected by it.
Ill
This case is really not about country-of-origin labeling. It is not even about patriotism or protectionism. And it is certainly not about health and safety. What is apparent from the record and the briefing is that this is a case about seeking competitive advantage. One need only look at the parties and amici to recognize this rule benefits one group of American farmers and producers, while interfering with the practices and profits of other American businesses who rely on imported meat to serve their customers. See, e.g., Interve-nors Br. at i (noting the United States Cattlemen’s Association “present[s] an effective voice for the U.S. cattle industry and promot[es] ranching in the United States”); id. (“[United States Cattlemen’s Association] works to promote the interests of cattlemen in the United States on issues such as the Country of Origin Labeling ... program”); id. (explaining the National Farmers Union is a “national organization representing the interests of farmers and ranchers across the United States ... by advocating the policy positions developed by its members ... on issues such as [country-of-origin labeling]”); Supp’l Br. of Amici Curiae Food & Water Watch, et al., at iv (describing amici as “intimately involved in, and [having] spent considerable resources on, advocating for ... the development of the [country-of-origin labeling] rule at issue in this case”); see, e.g., Br. of Amicus Curiae Government of Canada at 3-4, 9 (“[P]arts of the U.S. industry that produce both U.S.-origin and mixed-origin meat face” much higher costs than slaughterhouses that rely on domestic livestock — a cost differential the WTO concluded has a “detrimental impact ... [on the] competitive position of Canadian cattle and hogs in the U.S. market [that] could not be explained by the need to” inform consumers). Even the court’s citation to the congressional record underscores this point. See Maj. Op. at 24 (citing statements from U.S. representatives hailing from Western states, including Oregon (Hooley and Wu) and California (Bono)). Such a disproportionate burden “stands in sharp conflict with the First Amendment’s command that government regulation of speech must be measured in mínimums, not máximums.” Riley, 487 U.S. at 790, 108 S.Ct. 2667.
Of course the victors today will be the victims tomorrow, because the standard created by this case will virtually ensure the producers supporting this labeling regime will one day be saddled with objectionable disclosure requirements (perhaps to disclose cattle feed practices; how their cattle are raised; whether their cattle were medically treated and with what; the environmental effects of beef production; or even the union status or wage levels of their employees). Only the fertile imaginations of activists will limit what disclosures successful efforts from vegetarian, animal rights, environmental, consumer protection, or other as-yet-unknown lobbies may compel.
*53 If patriotism or protectionism would sell products, producers and sellers would happily festoon their products with Made in the USA or Product of the USA labels. Thus, any consumer’s desire to buy American could be easily satisfied by voluntary action. See, e.g., 2009 Rule, 74 Fed.Reg. at 2682. Yet today this court offers to facilitate blatant rent-seeking behavior by announcing its willingness to intuit the government’s unspoken agendas — perhaps one of the most dissembling things about the court’s opinion. But, as bad as it is for the court to invent rationales the government does not actually offer, the reality is worse.
By substantiating the government’s nebulous interests, the court essentially permits the government to commandeer the speech of others. There is no limiting principle for such a flimsy interest as the government asserted in this case. See Tr. of Oral Arg. at 28, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc) (“There is absolutely no stopping point to [the government’s consumer-interest] argument.”); id. (Judge Kavanaugh: “The government wants no stopping point to that argument.”). More alarmingly, such self-referential interests can be marshalled in aid of any sort of crony capitalism or ideological arm-twisting. This labeling scheme is only one example.
The scheme is not designed to inform consumers; it is designed to take away the price advantage enjoyed by one segment of a domestic industry. The government’s alleged interest in providing information that some consumers may desire will actually result in higher prices. See, e.g., Br. of Amicus Curiae Grocery Manufacturers Association at 11 (“The severe costs that the COOL requirements will impose on GMA’s members are entirely out of proportion to the ethereal goal of affording consumers more information.... ”); see id. at 11-12 (“If the COOL requirements are sustained, that sort of supply-chain management will become extremely costly or, for some manufacturers, cost prohibitive .... ”). Forcing meat packers to pay a premium for domestic beef will raise costs for consumers. Query whether the protections of the First Amendment should be abrogated for some businesses in order to benefit other businesses. That approach not only swallows important First Amendment protections, it does so in order to discriminate in favor of particular segments of particular industries. The first Amendment ought not be construed to allow the government to compel speech in the service of speculative or hypothetical interests for purely private benefits. Once we articulate such a principle of constitutional adjudication, there is really no limit to what government may compel. And if this example of cronyism is okay, who will balk at any other economic or ideological discrimination? The only limit the court seemed to recognize during the oral argument was labels that overtly promote invidious discrimination,[6] but protectionism, patriotism, and environmentalism will be entirely permissible subjects for compelled labeling, especially where the motive can remain unspoken. A generous swath of protection the First Amendment once afforded to businesses against such encroachment has now been ceded to the government’s allegedly good intentions.
IV
The court has taken a rationale developed in a specific context and applicable to *54 a narrow subset of government activity— regulating speech that could be entirely prohibited — and fashioned a new, broad area of government power in which naked compulsion, once prohibited by the First Amendment, no longer requires any credible justification. The court accomplishes this extraordinary feat by plucking the phrase “factual and uncontroversial” out of the Zauderer analysis while pointedly ignoring another limitation: that the compelled disclosure must be justified and not unduly burdensome. This is a move which tends to dissolve the whole idea of a right not to speak. It is strongly reminiscent of C.S. Lewis’s criticism of those who reject natural law and traditional morality:
There has never been, and never will be, a radically new [judgment] of value in the history of the world. What purport to be new systems or (as they now call them) ‘ideologies,’ all consist of fragments from the [natural law] itself, arbitrarily wrenched from their context in the whole and then swollen to madness in their isolation....
C.S. Lewis, The Abolition of MaN 43M4 (Harper Collins 2001) (1944). That is what the court now announces. What was merely an observation in the well-ordered framework of Zauderer now becomes an overarching principle that subsumes the First Amendment. And it does so to facilitate coercion and the imposition of orthodoxy. What is more uncontroversial than orthodoxy?
There can be no right not to speak when the government may compel its citizens to act as mouthpieces for whatever it deems factual and non-controversial and the determination of what is and what is not is left to the subjective and ad hoc whims of government bureaucrats or judges. In a world in which the existence of truth and objective reality are daily denied, and unverifiable hypotheses are deemed indisputable, what is claimed as fact may owe more to faith than science, and what is or is not controversial will lie in the eye of the beholder.
AMI’s counsel began the en banc argument by positing an absurdity no sensible court could countenance — that Zauderer somehow permits the government to compel speech based on “any interest, no matter how articulated, no matter how speculative.” Today, the court’s commitment to country-of-origin labeling leads it to willfully distort the fundamental holding and limitations of Zauderer and a virtually unbroken line of Supreme Court precedent to do exactly that — a perniciously Procrustean solution that hacks the First Amendment down to fit in the government’s hip pocket. I will not join the carnage.

. Accord United States v. United Foods, Inc., 533 U.S. 405, 416, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) (noting, in Zauderer, that the Court permitted disclosure mandates for "attorneys who advertised by their own choice" and made potentially misleading statements (emphasis added)).

. Significantly, in Milavetz, the Court also declined to adopt the government's overarching description of the rule as bearing a reasonable relationship to a "valid state interest.” See Br. for the United States at 55, Milavetz, 559 U.S. 229, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010) (Nos.08-1119, 08-1225), 2009 WL 3391429.

. When compelled disclosures do not contain "purely factual and uncontroversial information'' to correct deception in advertising, strict scrutiny applies. Zauderer, 471 U.S. at 651, 105 S.Ct. 2265; accord Pac. Gas & Elec. Co., 475 U.S. at 12-15, 106 S.Ct. 903.

. See AMI’s First Amended Complaint, Am. Meat Inst. v. USDA, 968 F.Supp.2d 38 (D.D.C. 2013) (No. 13-CV-1033), ECF No. 15, reprinted in J.A. 25-26, ¶¶ 72-79; Am. Meat Inst. v. USDA, 746 F.3d 1065, 1067-68 (D.C.Cir.2014) ("[AMI] challenged the 2013 rule in district court as a violation of the COOL statute and the First Amendment.”); Maj Op. at 21 ("AMI argues that the 2013 rule violates its First Amendment right to freedom of speech....”).

. See George Orwell, Nineteen Eighty-Four (1949).

. See Tr. of Oral Arg. at 56, Am. Meat. Inst., No. 13-5281 (D.C.Cir. May 19, 2014) (en banc) (Chief Judge Garland making the government’s point that "it [is] a violation of the Constitution to discriminate on the basis of national origin among people already in the United States”).